Filed 3/14/25  P. v. Muro CA5

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>JOSE MURO, JR.,<br><br>    Defendant and Appellant. | F087896<br><br>(Super. Ct. No. BF197205A)<br><br><br>**OPINION** |

-----

## THE COURT[*]

APPEAL from a judgment of the Superior Court of Kern County.  David R. Zulfa, Judge.

Marcia Clark, under appointment by the Court of Appeal, for Defendant and Appellant.

Office of the State Attorney General, Sacramento, California, for Plaintiff and Respondent.

-ooOoo-

-----

[*]    Before Peña, Acting P. J., DeSantos, J. and Fain, J.[†]

[†]    Judge of the Fresno Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

## INTRODUCTION

On November 2, 2022, appellant and defendant Jose Muro, Jr. (appellant) shot and seriously wounded Hector Vasquez. At the time of the shooting, Vasquez was dating appellant's former girlfriend, Deja Parra, and appellant shot Vasquez when he discovered Vasquez was at Parra's house. Appellant was charged with premeditated attempted murder. After a jury trial, he was convicted of attempted voluntary manslaughter as a lesser included offense, along with other offenses, with firearm and great bodily injury enhancements. He was sentenced to an aggregate term of 27 years in prison.

On appeal from the judgment, appellate counsel filed a brief that summarized the facts with citations to the record, raised no issues, and asked this court to independently review the record. (*People v. Wende* (1979) 25 Cal.3d 436.) In response to this court's *Wende* letter, appellant filed a supplemental brief and argued Parra and Vasquez gave false and contradictory testimony, he did not receive a fair trial, and his sentence was too high. We review his contentions and affirm.

## FACTS

Parra and appellant had been in a relationship, lived together in a house in Bakersfield, and were the parents of one child, who was born in 2021. In or about July 2022, appellant and Parra broke up, and appellant moved out of the house.

As of November 2022, Parra and the child continued to live in the same house. Appellant regularly visited the child at Parra's house. Vasquez was dating Parra. Appellant and Vasquez had never met, and they did not know each other.

At appellant's jury trial, Parra, Vasquez and appellant each testified about what happened before, during, and after appellant shot Vasquez.

### Parra's Testimony About the Text Messages

Parra testified that in or about September 2022, after she broke up with appellant, she sent the following messages to him: " 'You're getting f[***]ed up. Mark's going to beat you're a[**].' " She also told appellant, " 'He's going to beat your f[***]ing

2.

a[**],' " and " 'That's not threatening you. I'm letting you know it's a promise. He's going to beat the f[***] out of you.' " Parra testified she was not joking when she made these threats. She knew appellant was "just upset about me seeing Mark in the past." Parra was angry because appellant and his family made threats to her, and she "just said whatever I could say that I knew would get under his skin."[1]

On or about Tuesday, November 1, 2022, appellant and Parra exchanged text messages. Appellant told Parra not to have other men around their child or he would kill Parra. A couple of hours later, appellant texted Parra and asked whether she would be dropping off their child that evening, and she agreed.[2]

**Appellant and Vasquez Separately Arrive at Parra's House**

On November 2, 2022, Parra and the child were at their house. Around 3:30 p.m., Parra contacted appellant and asked him to come over so he could take their child to the doctor. Appellant agreed to come after work. He was late and they exchanged several calls and messages. Parra testified that she learned appellant was not at work anymore, and appellant told her that he was drinking with friends. Parra told appellant not to come because he was so late.[3]

Sometime after Parra exchanged the calls and texts with appellant, Vasquez arrived at her house. Parra had not expected Vasquez to come over that day.

---

[1] Parra initially denied she made any threats against appellant. On further questioning, she eventually admitted doing so. The evidence established that Vasquez was not "Mark," and there was no further testimony to identify "Mark."

[2] As will be addressed below, appellant objected to the introduction of the texts with the threats to Parra. The trial court held a pretrial evidentiary hearing on the issue, and held the evidence was admissible.

[3] As also will be discussed below, Parra testified that in her previous statements to the police, she never disclosed that appellant said he was drinking with friends. She also admitted she did not mention this fact when she testified at the preliminary hearing because she was not asked about the subject.

Parra testified that around 5:30 p.m., about five minutes after Vasquez arrived, appellant also arrived at her house. Parra was getting ready to leave with Vasquez to take the child to the doctor.

Appellant walked around the yard and tried to get in the house. Parra was on the telephone with him, and told him to stay out of the house and leave. After about 10 minutes, Parra opened the solid front door and kept the metal screen door closed. Parra stood inside the doorway behind the screen. Appellant remained outside, and they argued through the screen door for about five minutes. Parra repeatedly told appellant to leave but he ignored her requests.

Parra testified appellant kept asking if Vasquez was in the house. Appellant told Parra to either open the screen door or tell Vasquez to go outside, and Parra refused. On cross-examination, Parra was asked whether appellant was calling, " 'Hey, Hector. Come outside,' was he?" Parra testified, "Not by name, no," and clarified appellant and Vasquez had never met, appellant did not know Vasquez's name, and appellant did not call him by name.

Parra testified that as she argued with appellant, their child stood in front of her in the doorway. Vasquez was sitting in the living room.

Parra testified Vasquez eventually walked up to the front door and stood behind her. The screen door remained closed. Vasquez wanted to leave, but Parra would not let him go outside because she did not want appellant and Vasquez to fight.

**Parra's Testimony About the Shooting**

Parra testified that about one minute after Vasquez appeared in the doorway, appellant produced a gun from his pants. The gun was black, and it had an extended magazine and a "laser" mounted on top.

Appellant fired a single shot through the metal screen door. When he fired, Parra and the child were standing in the doorway, and Vasquez was standing behind Parra on her right side.

Parra testified that after appellant fired the single gunshot, he ran to the gate in her front yard but turned around, returned to the front of Parra's house, and looked through the window. Appellant bent down, appeared to pick up a shell from the ground, and ran away.

**Vasquez's Trial Testimony**

Vasquez testified he went to Parra's house around 5:30 p.m. Vasquez thought appellant arrived at Parra's house 30 minutes to one hour later, but he was not sure about the time. Vasquez had never met appellant or had prior contact with him.

Vasquez testified appellant and Parra argued at the front door. Vasquez sat on the couch, and he heard appellant ask to enter because he wanted to know who was there. Parra refused to let appellant in, and appellant never got inside.

Vasquez thought about leaving so he could stay out of the "drama." He tried to "deescalate" the situation by telling Parra to ignore appellant and call the police, but she did not do that.

Vasquez testified he walked to the open front door where Parra was standing. The metal screen door was closed. Appellant told Vasquez to come outside, but Vasquez stayed in the house. Appellant and Vasquez began to argue and called each other names. Appellant challenged Vasquez to a fight, and Vasquez challenged appellant. Parra and Vasquez kept telling appellant to leave.

Vasquez testified appellant finally left. Vasquez stayed at the front door to keep his eyes on appellant. Appellant walked away and disappeared from sight. About five minutes later, appellant returned to the house and knocked on the front door. Parra opened the outer door but not the metal screen door. Vasquez again stood with Parra and the child at the doorway.

Vasquez testified appellant pulled a gun, raised it, and fired one shot through the metal screen door. The bullet hit Vasquez on the right side of his body in the rib cage

area.  Vasquez was shocked and fell backwards.  Parra screamed, and appellant kept telling Parra to open the door.  Vasquez told her to close the door and call the police.

**Parra's Cell Phone Videos**

Parra testified she recorded two separate videos on her cell phone that showed her argument with appellant at the front door.  The videos were played for the jury.

Parra testified she started recording the first video after appellant had been arguing with her for somewhere between one to four minutes.  When the first video started, appellant told Parra, "You liked it."  Parra replied, "No, get the f[***] out.  You can't come in."  Appellant asked why, and Parra said, "Because you can't."  Appellant asked if she had "somebody" there, and Parra said yes.  Appellant asked if that was why her truck was "here" and she said yes.  Appellant said, "What a case," and Parra responded, "All right," and the first video ended.

Parra testified she started recording the second video about 30 seconds after the conclusion of the first video.  In the second video, Vasquez asked appellant, "Bro, what's up?"  Appellant told him to come outside.  Parra said no, "we're not doing that."  Appellant told Vasquez, "Come outside, bro."  Vasquez said, "Bro, hurry up, I got to go."  Parra said they were not doing that.  Appellant again said to come outside and used a racial epithet.  Parra replied, "What the f[***]!"  Appellant said, "What's up," and used the same racial epithet.  Parra again replied, "What the fuck!"

The second video had the sound of appellant firing the single gunshot.  After he fired, appellant said, "Yeah, you going to die," and again used the same racial epithet."

**The Neighbor's Video**

Nancy Valles lived across the street from Parra.  She had a security camera affixed to the outside of her residence.  The camera recorded video and audio of the events at Parra's front door before and after the shooting.  The video showed appellant at the front door.  Parra swore at him, and appellant repeatedly asked Parra to give their child to him.

6.

Valles testified she recognized appellant, and saw him drive away very fast from Parra's house.

**The Investigation and Vasquez's Gunshot Wound**

Kern County Deputies Max Mendoza and Nathan Pucilowski were the first officers to respond to Parra's house on the shooting dispatch. Parra was visibly upset, and reported her boyfriend had been shot. She said appellant was the gunman, he drove away in a grey Infiniti, and provided the license plate number. There was a bullet hole in the screen door. An expended round was not found.

Vasquez was lying on the kitchen floor, holding a towel to his chest. Vasquez had a gunshot entry wound to his right chest area, and an exit wound in the same area on his back. Vasquez was transported to the hospital by the paramedics.

Mendoza followed Vasquez to the hospital, and briefly spoke to him before he was taken into surgery. Vasquez said he had been trying to leave Parra's house, and that appellant kept calling him outside.

At trial, Vasquez testified the bullet entered the right side of his stomach and hit his liver, and staples were placed in his stomach. He was in the hospital for two months. He had to return to the hospital because of a liver infection in the wound area and remained there for another month. When he was discharged, he needed help from his family before he fully recovered.[4]

**Parra's Injury**

Parra's child was not injured. Parra had a circular injury under her right collar bone. She thought the bullet went through the metal screen door, dislodged a piece of metal from the door, the piece hit her body, and the bullet continued into Vasquez's body. Parra testified nothing else happened that could have caused this injury. Parra did not

---

[4]    By the time of trial, Parra and Vasquez were no longer in a relationship.

initially feel or notice the injury, she was not bleeding, and she did not find shrapnel on her body. She was not treated at the scene by paramedics and did not go to the hospital.

Parra testified the injury was "fleshy" and "just stung" her. She had some pain that was a "four" out of 10, and the metal left a mark near her shoulder for about two weeks.

Pucilowski testified that when the deputies arrived on the dispatch, Parra showed them a wound on her upper right chest area. Pucilowski determined it was not caused by a gunshot. There were no holes in Parra's clothing, she did not complain of pain, and she was not bleeding. Pucilowski described the injury as a flesh wound, and believed it could have been caused by shrapnel from either the bullet or the metal screen door. Pucilowski acknowledged that Parra's wound could have been consistent with a nonshrapnel injury, such as a scab wound. Pucilowski did not mention Parra's wound in his report because another officer took her statement at the scene.

On November 3, 2022, Deputy Rebekah Karr conducted a follow-up investigation at Parra's house, and took photographs of the bullet hole through the screen door and Parra's injury. Karr testified the injury appeared to be fresh, and consistent with being caused by some type of debris. Karr testified the photographs of Parra's wound also showed acne type marks in the same area on her body. The injury could have been consistent with a "popped acne pimple," but Karr could not be sure.

**Search of Appellant's Residence**

On November 3, 2022, deputies searched appellant's residence pursuant to a warrant. Appellant was present and arrested. His car was parked near the residence.

In the house, the deputies found a Glock 19 nine-millimeter handgun under a sofa cushion. A magazine loaded with nine-millimeter ammunition was next to the gun. The Glock had a flashlight mounted on top of it, and the gun was registered to appellant.

A backpack was found in a bedroom. It contained two high-capacity magazines loaded with nine-millimeter rounds, which would have fit the Glock firearm.

8.

**Appellant's Trial Testimony**

Appellant testified that on November 2, 2022, he went to Parra's house directly from work because they were going to take their child to the doctor. Appellant did not go drinking with friends. Parra never told him not to come over. When he arrived at the house, appellant became concerned because there was an unfamiliar truck parked in front, and the front gate was unlocked.

Appellant stayed outside and tried calling and texting Parra. She did not answer. Appellant testified he used his cell phone's speaker as he tried to contact Parra, and he was not holding the cell phone up to his ear. Appellant walked inside the house's front gate, knocked on the front door, and no one answered. He walked around the house and looked in the windows, and did not see anyone. Appellant was confused because Parra and their child were supposed to be home.

Appellant again tried to contact Parra. She finally replied by text message, and said they took a Lyft to the doctor. Appellant was still concerned something was wrong, tried to call her again, and she did not respond.

Appellant testified he retrieved his handgun from the lockbox in the glove box of his car because he was concerned for the safety of Parra and their child. Appellant did not plan to shoot anyone. He did not put the gun in his car because he was going to take his child to the doctor; it was already in his car. The gun was registered to him, and it did not have an extended magazine.

Appellant walked back to the house, called Parra again, and she did not answer. He looked through the windows and was about to leave, when Parra opened the front door, and kept the metal screen door closed.

Appellant and Parra talked and argued through the screen door. Parra said appellant could not enter the house but never told him to leave the property.

Appellant testified that after about three minutes, a man appeared at the front door with Parra. Appellant had never seen this man and later learned his name was Vasquez.

9.

Vasquez said to appellant, " 'Bro, what's up' " in an aggressive manner and they began to argue.  Parra told him to leave, but appellant was not sure whether she was referring to Vasquez or himself.

Appellant was frightened because Parra previously threatened to have someone named "Mark" hurt him.  Appellant testified Parra's cell phone videos did not show the entire exchange with Vasquez, and that Vasquez told him, "[D]o you want me to go out there and beat your ass."  Appellant testified things went very fast and he did not think he had time to call the police for help.  Appellant knew his child was also standing in the doorway, but he was only focused on Vasquez and his threats.

Appellant admitted he told Vasquez to come outside, but he only did so because Parra said Vasquez wanted to leave.  Appellant did not intend to assault him.

Appellant admitted he shot Vasquez because he was frightened by Vasquez's aggressive behavior, and thought he was "Mark" who Parra identified in her prior threats.

Appellant denied he previously threatened Parra.  Appellant admitted he told Vasquez that he was going to die when he fired the gunshot.  Appellant also admitted he picked up the spent casing when he left Parra's house.  He did not know why he said or did these things because he was not thinking straight.

Appellant acknowledged that after he was arrested, he falsely told officers that Parra called him that day to deal with a man who was about to beat her.  Appellant eventually told them the truth.

**Rebuttal Evidence**

Mendoza testified he conducted appellant's postarrest interview with Deputy Nathaniel Inman on November 3, 2022.  Appellant was advised of the warnings pursuant to *Miranda v. Arizona* (1966) 384 U.S. 436 and he agreed to answer questions.  The recorded interview was played for the jury.

During the interview, appellant was asked about the shooting the previous day.  Appellant said he did not know anything about it, he had not seen Parra for a few days,

10.

and she blamed him because he was trying to get visitation rights for their child. Appellant said Parra called him the day of the incident and said she was fighting with a man at her house, and the man was "beating her a[**]." Parra had previously called him for help when they were together. This time, appellant told Parra they were no longer together and she should call the police, and he did not go to her house.

The deputies advised appellant that Parra recorded videos on her cell phone that showed someone at the front door. Appellant said he knew about the videos because Parra was telling everyone that she filmed him, but he was not there. The deputies further advised appellant that one video recorded the sound of a gunshot, showed appellant running away and driving off, and his car's license plate was captured by license plate readers as it left the scene. There was also a neighbor's surveillance video that showed him arguing at Parra's front door. Appellant denied that he was on the videos.

Appellant eventually admitted Parra called him that day, and she asked him to come to the house and take their child to the doctor. Appellant was late because he worked overtime. Just as he drove up to Parra's house, she called and complained he was late, and said they already took a Lyft to the doctor.

Appellant said he saw an unfamiliar truck parked in front of Parra's house and thought that was strange. Appellant had to use the restroom and tried to enter the house because Parra usually left the door unlocked. Vasquez appeared at the front door just as appellant was about to open it. The screen door remained closed.

Appellant said he was surprised and asked if Parra was there. Vasquez said no and told appellant to leave. Appellant said he was there to take his child to the doctor. Parra appeared and said she would take care of it. Vasquez threatened to beat him up. Vasquez asked appellant if Parra told him to come over so he could beat up Vasquez. Appellant said no. They began to argue. Vasquez put his hand on the door and called him a b****.

11.

The deputies asked appellant what he did next. Appellant said he fired one shot because he was scared, and noted that "you guys heard the popping noise" on the video. Appellant was afraid because Vasquez was bigger than him, he did not want to fight him, and he did not know if Vasquez had a knife. Appellant did not try to run away because he thought there was not enough time.

Appellant admitted that after he fired the gunshot, he told Vasquez he was going to die. Appellant said he was not in his right mind when he said that. Appellant was angry that Vasquez was in the house because Parra said she would not allow other men around their child. Appellant admitted he picked up the shell casing after he fired the gunshot, but could not explain why. He thought he threw the casing out the car window. Appellant later told his sister what happened. His sister said he was stupid and he should have left, and she took his gun from him. He thought his sister threw away his gun.

## PROCEDURAL BACKGROUND

On February 8, 2024, an amended information was filed that charged appellant with several counts, including count 1, premeditated attempted murder of Vasquez (Pen. Code,[5] §§ 664, 187, subd. (a), 189, 1192.7, subd. (c)(9)), and that he personally and intentionally used and discharged a firearm causing great bodily injury in the commission of that crime (§ 12022.53, subd. (d)); and other offenses with firearm and great bodily injury enhancements, with multiple aggravating factors alleged pursuant to California Rules of Court, rule 4.421.[6]

### Verdicts

On March 15, 2024, the jury found appellant not guilty of count 1, premeditated attempted murder of Vasquez, and guilty of the lesser included offense of attempted voluntary manslaughter (§§ 664/192, subd. (a)), and found true the enhancements for

---

[5]    All further statutory references are to the Penal Code unless otherwise noted.

[6]    All further citations to rules are to the California Rules of Court.

12.

personal use of a firearm (§ 12022.5, subd. (a)) and infliction of great bodily injury (§ 12022.7).

The jury also found appellant guilty as charged of count 2, assault with a semiautomatic firearm on Vasquez (§ 245, subd. (b)), with enhancements for personal use of a firearm (§ 12022.5, subd. (a)) and infliction of great bodily injury; count 3, discharge of a firearm into an inhabited dwelling (§ 246), with an enhancement for personal and intentional discharge of a firearm causing great bodily injury (§ 12022.53, subd. (d)); count 4, child endangerment under circumstances likely to produce great bodily injury (§ 273a, subd. (a)) with the personal use enhancement; count 5, misdemeanor destruction of evidence (§ 135); count 6, assault with a firearm on Parra (§ 245, subd. (a)(2)), with the personal use enhancement; and count 7, assault with a firearm on the child (§ 245, subd. (a)(2)) with the personal use enhancement.[7]

### *Trial on Aggravating Factors*

Appellant waived a jury trial on the aggravating factor allegations in the amended information. The court granted the People's motion to consider the trial evidence for the truth of the allegations, and appellant's request to take judicial notice that appellant did not have a criminal record.

The trial court found the following aggravating factors alleged in the amended information were true beyond a reasonable doubt: the offenses involved great violence, great bodily injury, or other acts disclosing a high degree of cruelty, viciousness or callousness pursuant to rule 4.421(a)(1); appellant was armed with or used a weapon in the commission of the crime pursuant to rule 4.421(a)(2); he engaged in violent conduct indicating a serious danger to society pursuant to rule 4.421(b)(1); and circumstances in

---

[7] As to count 2, the jury returned guilty verdicts for both the charged offense of assault with a semiautomatic firearm on Vasquez and the lesser included offense of assault with a firearm. The court suggested, and the parties agreed, to strike the guilty verdict for the lesser offense.

13.

aggravation included any other factors that reasonably relate to the defendant or the circumstances under which the crime was committed pursuant to rule 4.421(c).

**Sentencing**

On April 15, 2024, the trial court conducted the sentencing hearing, and found appellant did not have a criminal record, and the jury did not find him guilty of premeditated attempted murder. The court also found appellant shot the victim in the presence of his young child, the gunshot hit Vasquez in his "center mass torso through and through with significant internal injuries," and the wound could have been fatal.

The court found mitigating circumstances that appellant did not have a prior criminal record, there were multiple enhancements, and application of an enhancement could result in a sentence of over 20 years.

The court found the aggravating circumstances that were pleaded and proved true pursuant to rule 4.421(a)(1), (a)(2), and (b)(1) were sufficient to outweigh the mitigating factors to permit imposition of upper terms.[8]

In determining appellant's aggregate sentence, the trial court considered "not only the conduct and the individuals involved but also [appellant's] individualized background and history as well as his conduct in this situation." The court dismissed the section 12022.53, subdivision (d) firearm enhancement that carried the potential life term.

---

[8]    In *Lovelace v. Superior Court* 108 Cal.App.5th 1081, 1089, the First District, Division Four recently held the aggravating factor stated in rule 4.421(c)'s "residual clause" was "so vacuous as to be devoid of meaning" in violation of the separation of powers clause in the California Constitution, because "by granting prosecutors—and ultimately juries—an open-ended power to define sentencing criteria on an ad hoc basis, the residual clause exceeds the Judicial Council's delegated authority to adopt rules designed to 'promote uniformity in sentencing' under section 1170.3."

*Lovelace*'s ruling does not affect this case. At appellant's bifurcated trial on the aggravating factors, the court found true the aggravating factor alleged as to rule 4.421(c). At the sentencing hearing, however, the court found the aggravating circumstances found true under rule 4.421(a) and (b) outweighed the mitigating circumstances to impose the upper terms, and it did not rely on rule 4.421(c).

The court imposed an aggregate sentence of 27 years as follows:  count 2, assault with a semiautomatic firearm on Vasquez, the upper term of nine years, plus 10 years for the section 12022.5, subdivision (a) personal use enhancement and three years for the great bodily injury enhancement; a consecutive term of 16 months for count 4, child endangerment under circumstances likely to produce great bodily injury, plus 16 months for the personal use enhancement (one-third the midterms); and a consecutive term of one year for count 6, assault with a firearm on Parra, plus 16 months for the personal use enhancement (one-third the midterm).  The court stayed the sentences and enhancements imposed for counts 1, 3, 5, and 7.

After imposing sentence, the trial court stated:  "I know I just imposed a significant sentence.  That is not lost on the court.  But you must understand your conduct is also not lost on the court and I did my best to do what I think was the appropriate sentence balancing what you did with who you are," the aggregate sentence "could have been much worse," and the court wanted appellant to understand the sentence was "reflective of your conduct but also reflective of who you were prior to that day."

On April 16, 2024, appellant filed a timely notice of appeal.

## DISCUSSION

As noted above, appellant's counsel filed a *Wende* brief with this court.  The brief also included counsel's declaration indicating appellant was advised he could file his own brief with this court.

In response to this court's *Wende* letter, appellant filed a supplemental brief and requested this court "to look over" the testimony of Parra and Vasquez because their statements were false and contradictory.  Appellant raises several specific claims about the alleged falsity of Parra's testimony, and asserts her statements should have been excluded because she was unreliable and dishonest.  Appellant further asserts he did not receive a fair trial because the alleged false testimony and exhibits were admitted into

15.

evidence "just to make me … look bad in front of the jury …." Appellant also argues he was "oversentenced."

## A.  Substantial Evidence and Evidence Code Section 352

Appellant's arguments raise the question about whether there is substantial evidence to support his convictions.  "In reviewing a claim for sufficiency of the evidence, we must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime or special circumstance beyond a reasonable doubt.  We review the entire record in the light most favorable to the judgment below to determine whether it discloses sufficient evidence—that is, evidence that is reasonable, credible, and of solid value—supporting the decision, and not whether the evidence proves guilt beyond a reasonable doubt.  [Citation.]  We neither reweigh the evidence nor reevaluate the credibility of witnesses.  [Citation.]  We presume in support of the judgment the existence of every fact the jury reasonably could deduce from the evidence." (*People v. Jennings* (2010) 50 Cal.4th 616, 638–639.)

" 'It is for the trier of fact to consider internal inconsistencies in testimony' [citation], and it is for [the appellate court] when reviewing for substantial evidence to resolve the inconsistencies in favor of the verdict." (*People v. Collins* (2021) 65 Cal.App.5th 333, 345.)  "Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact.  [Citation.]  Moreover, unless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction." (*People v. Young* (2005) 34 Cal.4th 1149, 1181.)  Reversal is "unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction.]' " (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

Appellant's arguments that the testimony of Parra and Vasquez was introduced to make him look "bad" also implicate the provisions of Evidence Code section 352, that

provides evidence is subject to exclusion "if the probative value of the evidence is outweighed by a danger of undue prejudice. [Citation.] ' "The 'prejudice' referred to in … section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues. In applying section 352, 'prejudicial' is not synonymous with 'damaging.' " ' " (*People v. Megown* (2018) 28 Cal.App.5th 157, 164.) We review the court's evidentiary decisions for an abuse of discretion. (*Ibid*.)

**B. Parra's Testimony that Appellant Said He Was Drinking with Friends**

We turn to appellant's specific contentions about why Parra's testimony was false and unreliable. First, appellant asserts Parra lied when she falsely testified that he was late to her house because he was drinking with friends.

Parra testified that when appellant was late, she contacted him and appellant said he was drinking with friends. Parra's testimony was impeached on this point because she admitted she failed to disclose appellant's statements about drinking in her prior interviews with officers or at the preliminary hearing.

The jury heard appellant's trial testimony, that he was not drinking with friends, and he went to Parra's house after he finished work. In addition, the jury heard the recording of appellant's postarrest interview, where he said that he was late because he had to work overtime.

Parra's testimony about appellant's statements about drinking was admissible because the conflicts with appellant's testimony, and her own failure to previously disclose this information, raised factual and credibility disputes for the jury to resolve. The evidence may have been damaging but was not prejudicial, and her testimony was not physically impossible nor inherently improbable.

17.

## C.  Parra's Testimony That Appellant Was on His Cell Phone

Appellant next asserts Parra falsely testified he was on his cell phone with her the entire time he was outside the house, and she was lying because the videos showed he never had the phone at his ear.

Appellant's claim is refuted by his own trial testimony.  Appellant testified that when he arrived at Parra's house, he was outside and tried calling and texting her on his cell phone.  Appellant was asked, "When you were calling her, was that to your ear or was that on speaker?"  Appellant replied, "On speaker."  Appellant's testimony thus explained why the video may have shown that he was not holding the cell phone to his ear, and raised another factual issue for the jury to resolve.

## D.  Parra's Injury

Appellant's next allegation is Parra's testimony was false and unreliable because she claimed the bullet hit the metal screen door and caused shrapnel to hit her in the chest, and she was lying because Parra also agreed her wound could have been a pimple.

The existence and nature of Parra's injury were extensively addressed before the jury.  Parra thought the bullet dislodged a piece of metal from the screen door, and the metal hit her body under her right collar bone.  Parra acknowledged that she did not initially feel or notice her wound.

Pucilowski described Parra's injury as a flesh wound, and believed it could have been caused by shrapnel from either the bullet or the metal screen door.  Pucilowski acknowledged that Parra's wound could have been consistent with a nonshrapnel injury, such as a scab wound.

Karr testified the wound appeared to be fresh, and it was consistent with being caused by some type of debris.  Karr acknowledged the photographs showed acne marks on the same area of Parra's body, one of which could be consistent with a "popped acne pimple," but Karr could not be sure.

18.

As with appellant's other objections to Parra's testimony, the jury was well aware of different descriptions about her injury and could examine the photographs. These conflicts again raised factual and credibility issues for the jury to resolve. Parra's testimony was not prejudicial, physically impossible, or inherently improbable.

### E.  Appellant's Use of Vasquez's Name

Appellant argues Parra lied when she testified appellant and Vasquez had never met, and falsely claimed he called Vasquez by his name when they argued at the front door.

This issue was also raised before the jury. On direct examination, Parra testified appellant repeatedly told Vasquez to come outside. On cross-examination, Parra was asked if appellant was calling him out by name. Parra testified, "Not by name, no," and she acknowledged appellant and Vasquez had never met, and appellant did not know Vasquez's name.

Vasquez testified he had never met appellant. Appellant also testified that when Vasquez stepped into the doorway, he had never seen this man and later learned the man was Vasquez.

To the extent there was a conflict on this issue, it was addressed by additional testimony and again raised factual and credibility issues for the jury's resolution.

### F.  Appellant's Text Messages to Parra

At trial, Parra testified that on or about Tuesday, November 1, 2022, the day before the shooting, appellant sent a text message telling Parra not to have other men around their child or he would kill Parra. Appellant argues Parra was improperly allowed to testify about these messages because she could not prove who sent them or when they were sent, and the messages could have been made up by someone else.

These issues were fully addressed by the court because prior to trial, appellant objected to the text messages as inadmissible and vague, and the court conducted a pretrial evidentiary hearing (Evid. Code, § 402) on the admissibility of this evidence.

The prosecutor made an offer of proof based on screenshots from Parra's cell phone of the threatening messages. Parra was called as a witness at the hearing, and testified appellant sent the messages to her "[m]aybe a few days prior" to the shooting, "[i]t was within the week," and "[m]aybe three days at most. It was very recent to that day of the shooting."

Also at the evidentiary hearing, the trial court took judicial notice the shooting occurred on Wednesday, November 2, 2022. The prosecutor and defense counsel agreed there were no time/date stamps on the screenshots or messages. The court found that "it appears as though this text threat occurred perhaps one to two days prior to the incident in the case but certainly within the three-day window to which she testified to and I will allow if proper foundation is laid with the jury [the exhibit] to be admitted. I do find that there is probative value that is not substantially outweighed by the prejudicial effects [*sic*] and you'll be allowed to cross-examine as you see fit … as to the issues that you've raised."

At trial, Parra testified as set forth above about appellant's threats in the text messages. Parra further testified she saved screenshots of the messages. The screenshots showed the messages were exchanged on "Tuesday," which was the day before the shooting, and it was too recent to have a date stamp.

The trial court did not abuse its discretion when it admitted Parra's testimony about the text messages, because the context of the messages was consistent with being sent close in time to the shooting. Moreover, the jury was aware that there were no time/date stamps on the messages, and Parra's credibility about when she received the messages raised another factual issue for the jury's determination.

## G. Appellant's Convictions Are Supported by Substantial Evidence

Appellant did not raise similar specific claims about alleged false statements in Vasquez's trial testimony. Instead, he asked this court to "look over" Vasquez's testimony because his evidence was false and made him look bad, and he did not receive a fair trial.

As set forth in the factual statement, we have reviewed the entirety of Vasquez's trial testimony, and there was nothing physically impossible or inherently improbable about his statements. Moreover, Vasquez's testimony was not unduly prejudicial in light of the probative value of his description of his encounter with appellant at the front door, and appellant's firing of the gunshot through the metal screen door. " ' " '[P]rejudicial' is not synonymous with 'damaging.' " ' " (*People v. Megown*, *supra*, 28 Cal.App.5th 157, 164.) Moreover, the jury's verdicts indicate that it carefully reviewed the evidence since it found appellant not guilty of the charged offense of premeditated attempted murder, and instead convicted him of the lesser included offense of attempted voluntary manslaughter.

We thus conclude that the testimony of Parra and Vasquez was properly admitted, any factual and credibility conflicts presented questions for the jury to resolve, and appellant's convictions are supported by substantial evidence.

## H.  Appellant's Aggregate Sentence

Appellant's final claim is that he was "oversentenced" to an aggregate term of 27 years. The trial court's sentencing decisions are reviewed for an abuse of discretion. (*People v. Mendoza* (2023) 88 Cal.App.5th 287, 298.)

As set forth above, the trial court made extensive findings to determine appellant's sentence. It had already found the aggravating factors were true beyond a reasonable doubt. The court found there were several mitigating circumstances, including appellant's lack of a criminal record.

The court had discretion to strike the enhancements in the interests of justice pursuant to section 1385. (*People v. McDavid* (2024) 15 Cal.5th 1015, 1020.) Section 1385, subdivision (c) enumerates nine mitigating circumstances the court must consider and afford great weight in determining whether to dismiss an enhancement, including when multiple enhancements are imposed in a single case, and when application of an enhancement could result in a sentence of over 20 years. (§ 1385,

subds. (c)(2)(B), (C).) "[I]f the court does not find that dismissal would endanger public safety, the presence of an enumerated mitigating circumstance will generally result in the dismissal of an enhancement unless the sentencing court finds substantial, credible evidence of countervailing factors that 'may nonetheless neutralize even the great weight of the mitigating circumstance, such that dismissal of the enhancement is not in furtherance of justice.'" (*People v. Walker* (2024) 16 Cal.5th 1024, 1029–1030.)

The trial court was aware that multiple enhancements had been found true, and it exercised its discretion to dismiss the section 12022.53, subdivision (d) firearm enhancement and the potential term of 25 years to life. However, the court did not abuse its discretion when it further concluded it could not ignore the seriousness of appellant's crimes because he inflicted a gunshot wound that could have been fatal, he fired the shot in the presence of his young child, and upper terms were appropriate because the aggravating circumstances pleaded and proved under rule 4.421(a)(1), (a)(2), and (b)(1), were sufficient to outweigh the mitigating factors. Appellant's sentencing contentions are meritless.

After independent review of the record, we find that no reasonably arguable factual or legal issues exist.

## DISPOSITION

The judgment is affirmed.